Filed 7/29/26  Lew v. Di Giacomo CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JAMES LEW,<br><br>        Appellant,<br><br>v.<br><br>LEONARDO ENRIQUE DI GIACOMO,<br><br>        Respondent. | D086030<br><br><br>(Super. Ct. No.: 24HR010931C) |

APPEAL from an order of the Superior Court of San Diego County, Rebecca Zipp and Blair Soper, Judges.  Affirmed.

James Lew, in pro. per., for Appellant.

No appearance for Respondent.

James Lew appeals the denial of his second of two applications for a civil harassment restraining order (CHRO) against Leonardo Enrique Di Giacomo, and of his motions for sanctions against Di Giacomo and Di

Giacomo's counsel.  He contends the trial court erred in denying his application.[1]  Finding no error, we affirm.

## I.  BACKGROUND

This case arises in the context of a contentious relationship between Di Giacomo and a woman who is his former girlfriend and the mother of his child.  The relationship ended in August 2023.  The following month, the former girlfriend learned she was pregnant.  She and Di Giacomo argued about her desire to give birth at home instead of at a hospital.  And, in March 2024, the child was delivered by a midwife in the girlfriend's apartment.

Until some time prior to the child's birth, Di Giacomo had what appears to have been a friendly relationship with the girlfriend's neighbor, Lew: "Oftentimes I would go . . . walking [my girlfriend's] dog and [Mr. Lew] would join . . . .  [¶]  The last two times that I saw him before my child was born, he bought me a coffee, and the last time I bought him a coffee."

But on the afternoon of the day the child was born, matters took a turn.

### A.    The Day of the Child's Birth

In Di Giacomo's telling:

> "The day of the birth, I knocked on the door [to my former girlfriend's apartment]. . . .   We had [had] good, friendly communication the day before. . . .   So I was bringing food to her.  [Her sister answered the door, and] her dog ran out . . . almost . . . into the street.  I tried to get the dog while I'm holding [the] food.  [¶]  And [Mr. Lew] comes out on the balcony, . . . he decides to be a vigilante, and he starts cursing me out constantly.  [¶]  So I left.  [Then] I came back.  I wanted to confront him because I didn't know

---

[1]    Di Giacomo did not file a respondent's brief.  Thus we resolve this appeal based on a review of the record, Lew's opening brief, and oral argument.  (*In re Marriage of Everard* (2020) 47 Cal.App.5th 109, 111, fn. 1.)  Our review of the record has included 32 exhibits (lettered A through FF) accompanying Lew's motion to augment the record, which we grant.

where he was coming from, given that we had [had a] friendly relationship before. . . . I didn't know where all this violence was coming from, so I wanted to confront him and then I left."

In Lew's telling:

"DiGiacomo was harassing . . . [the] member[s] of an at-home birthing team while the mother of his child . . . was in labor. [The mother and her sister] are both neighbors and friends of mine, from [whom] I'd been hearing the many ways [in which Di Giacomo had been] harassing her over her birth plan and threatening litigation after having been an absent-if-not-antagonistic financial non-contributor throughout her pregnancy.

"Sensing he was taking advantage of an all-female presence and their non-confrontational disposition in light of the situation, I called out to [the sister] and asked if he was there bothering them. After getting nonverbal confirmation . . . from [her] that he was antagonizing the situation, . . . I shouted out at him that 'nobody that lives here wants your deadbeat loser-ass here, you're trespassing, get the f**k out of here', the latter part chanted repeatedly until he left out of embarrassment over the attention being called to him out on the street.

"Minutes later, he returned and knocked at my door, scoffing at me (in Spanish) for thinking I'm such a tough guy and challenging me to come outside and get my ass beat before trying to forcibly open my security door. When his efforts at forced entry and to get a rise out of me failed, he called me 'marica'—a Spanish slur roughly translating to 'pussy' and/or 'faggot' depending on context—and hit the security door one more time as I closed the front door on him."

Three days later, in what he describes as an "attempt to make amends," Di Giacomo sent Lew a bouquet of flowers with a note saying: "Jimmie. I Am Really Sorry! I Have Nothing Against You." Thereafter, Di

3

Giacomo initiated paternity and child custody proceedings against the child's mother.

**B.     The Paternity and Child Custody Proceedings**

The paternity and child custody proceedings resulted, in October 2024, in a ruling acknowledging Di Giacomo as the child's father and granting him parenting time with the child.  In remarks accompanying that ruling, the family court commissioner expressed empathy for the "feelings of helplessness . . . [and] frustration [of] both parties," she reproached Di Giacomo for having gone "a little bit too far by showing up uninvited" to the former girlfriend's apartment on the day of the child's birth after having been told his presence was not wanted, she said it was important for "the tension to be brought down," and, toward this end, she urged the mother to try to help moderate the behavior of "the support people that you have."

**C.     The Two Rounds of Cross-Applications for CHROs Between Lew and Di Giacomo**

One of the people endeavoring to be supportive to the mother was Lew.  During the approximately six-month period that began on the date of the birth and that culminated in the family court hearing discussed *ante*, tensions between him and Di Giacomo intensified to the point that the two men filed not one but two rounds of cross-applications for CHROs against one another.

**1.     Round One (Case No. 24HR001463C), July 2024 – August 2024**

The first round of CHRO applications was initiated by Di Giacomo.  In July 2024, he filed an application in which he alleged:  that, on the day of the birth, Lew had "curse[d] me out and stated that he would beat me up"; and that, "on an ongoing basis" thereafter, Lew and Lew's roommate would "follow me around the neighborhood, cursing me out and saying they would

4

give me a beating."[2]  The following month, Lew filed a cross-application for a CHRO against Di Giacomo.[3]  And, following an evidentiary hearing that same month, the trial court (Judge Zipp) denied both applications without prejudice.

### 2. Round Two (Case No. 24HR010931C), October 2024 – January 2025

The second round of CHRO applications was initiated by Lew.  It commenced with the September 13, 2024, filing by Lew of the application that launched the present case.

#### a. Lew's September 2024 Application for a CHRO Against Di Giacomo

In a pair of declarations he filed as part of his application in the present case, Lew stated:  that, on two different days, Di Giacomo had taunted him by mockingly blowing kisses in his direction; that, on occasions when the two had found themselves walking towards one another in the neighborhood in which they both resided, Di Giacomo had not altered course; and that, on one such occasion, Di Giacomo had petted Lew's emotional support dog.

According to one of these declarations, the first "smug kissing taunt[]" occurred during August 2024 outside the courtroom in which the evidentiary hearing for the first round of CHRO applications had just occurred, and the second such incident occurred about three weeks later:

> "While returning home from a walk up the street, I heard
> the sound of two kisses being blown as I passed Good
> Omen, a local coffee shop.  I initially assumed them to be

---

[2]    On the same day that he filed his first application for a CHRO against Lew, Di Giacomo also filed such an application against Lew's roommate.

[3]    Lew's August 2024 application for a CHRO against Di Giacomo is not included in the record on appeal in the present case.

5

> between someone and their dog outside my peripheral
> vision and kept walking. About 20 paces later, the audial
> memory of hearing that particular sound while leaving the
> courtroom on August 14th resurfaced. Reluctantly, I
> turned around to find [Di Giacomo] standing behind me,
> smugly staring down at me. Since then, there has been an
> increase of crossing paths resulting from his deliberate
> choice to take walking routes that encompass the
> immediate vicinity of our apartment complex."

Lew also stated in this declaration that he had experienced fear and suffered emotional distress as a result of Di Giacomo's conduct toward him.

According to the second of the two declarations that Lew filed with his application for a CHRO in the present case:

> "[T]here have been repeated occurrences in which our paths
> cross within a 600 ft radius of my place of residence. Upon
> seeing him, I'll begin recording video, in order [to] deter any
> harassment and capture it should it occur.

> "On at least two occasions, he has not only maintained
> course in my direction and walked within my immediate
> vicinity; on one of those, he made what he knew would be
> unwelcome contact and pet[ted] my dog in passing a few
> feet behind me, as happened to be recorded on video."

On the day that Lew filed the CHRO application that included these two declarations, a temporary restraining order (TRO) issued.

Then, three days later, Lew filed a third declaration in support of his CHRO application in the present case. In this declaration Lew said that, on the previous evening, he had been outside Di Giacomo's apartment attempting to obtain a declaration from Di Giacomo's next door neighbor, when Di Giacomo arrived on the scene and addressed him in a hostile manner:

> "After a double-take and realizing that it was me talking to
> [the neighbor], Mr. Di Giacomo circled back and began

walking up the steps to approach us, cell phone in hand to record the interaction . . . .

As Mr. Di Giacomo approached . . . , he immediately began demanding to know what we were talking about. I responded to him that it was none of his business, and requested that he not approach me nor speak to me. He kept trying to press me and [the neighbor] for an explanation, and grew frustrated at my nonplussed dismissal and [the neighbor]'s reluctance to engage. He began walking away, turning after 3 steps to say to [the neighbor] 'we may have to ask you to come to court' as he resumed walking down the steps and back towards his car.

I apologized to [the neighbor] that Mr. Di Giacomo was threatening him and trying to make him regret his willingness to affirm the truth and fear getting dragged further into the matter, thanked him for his time and contribution towards my case, then descended the steps and began walking in the [direction] opposite to Mr. Di Giacomo and his vehicle to leave the premises, having accomplished my goal of getting at least one signature in the building.

I then noticed Mr. Di Giacomo approaching me yet again, and [so I] in turn stopped walking and began a new video recording of him. Mr. Di Giacomo said to me: 'you continue to harass me, and I'm calling the police' as he went back up the stairs to his apartment. I simply replied that I was there lawfully on legal business, and to please go ahead and call the authorities. Once it appeared that Mr. Di Giacomo was going to enter his residence and bring the unwanted interaction to its conclusion, I hit the button to stop recording right as he started [addressing me] again [as he was] descending the staircase. I calmly responded 'YOU talked to me. I did not approach you, and I've already asked you to stop talking to me.' At this point, Mr. Di Giacomo took a sharp turn and walked back to knock on [the neighbor]'s front door. I called out after Mr. Di Giacomo to 'leave him alone.' "

### b. Di Giacomo's October 2024 Response to Lew's September 2024 Application for a CHRO

On October 3, 2024, Di Giacomo filed his response to Lew's second-round application for a CHRO. In a declaration filed with this response, Di Giacomo declared:

> "[S]ince I filed a paternity action and motion for custody[/] visitation against the mother of my newborn [child] . . . , James Lew has held a personal vendetta against me.
>
> "[¶ . . . ¶]
>
> "I would simply like to be left alone by Mr. Lew . . . , and I can assure this Court that I will not be speaking or interacting with Mr. Lew . . . for any reason. Although we do live in the same neighborhood in University Heights, it is quite easy for us to avoid each other, in every respect, so that we may live our separate lives peacefully.
>
> "Contrary to what Mr. Lew has alleged, I have never blown kisses toward him—either in the courthouse or anywhere else for that matter. This is false.
>
> "[¶ . . . ¶]
>
> "I understand Mr. Lew has a strong, personal grudge against me because I have chosen to fight for custody of my six-month old [child], but there is simply no further need for these restraining orders or the frivolous claims made against me."

### c. The October and December 2024 Hearings

On October 7, 2024, four days after Di Giacomo had filed his response, an initial hearing occurred before Judge Zipp. The minute order from this hearing says:

> "An unreported chambers conference is held. [¶] Court notes parties agree to future status conference at the date and time below. This matter to trail pending child custody case. [¶] Per Court the temporary restraining order is

8

dissolved.  [¶]  Status hearing is continued to 12/9/24 at 1:30 PM"

The minute order from the December 9 hearing says:

"Counsel updates the Court regarding pending family case.  [¶]  Court notes petitioner request to proceed to hearing on this matter.  [¶]  Respondent [Di Giacoma] request for dismissal is denied at this time.  [¶]  Hearing on restraining order is continued on request of petitioner [Lew] to 1-29-25 at 1:30 PM."

### d. The First of Lew's Two Motions for Sanctions and Attorneys' Fees

On January 7, 2025, Lew filed in the present case a motion for sanctions and attorneys' fees against Di Giacomo targeting what he described as Di Giacomo's "frivolous and retaliatory filing of [CHRO] petitions" against Lew in the previous (round one) case against Lew and in a related case against Lew's roommate.  In his motion papers, Lew asserted that Di Giacomo had filed his first-round application for a CHRO against Lew:  (1) to retaliate for Lew having intervened on the day of Di Giacomo's child's birth; (2) to "prejudice the [f]amily [c]ourt against [Lew]'s anticipated testimony" in the family court matter; (3) to weaken the mother's support system; (4) to impeach the mother's fitness as a parent "on the basis of prospectively allowing her child near [Lew] when active restraining orders are in place"; (5) to harass Lew; and (6) to cause delay.

### e. Di Giacomo's January 2025 Cross-Application for a CHRO and His Further Response to Lew's September 2024 Application for a CHRO

On January 10, 2025, Di Giacomo filed a cross-application for a CHRO, and a further response to Lew's September 13, 2024, application.  In these filings, Di Giacomo denied Lew's allegations and asserted that Lew had been tracking him, videotaping him, recording his movements, threatening him,

9

making obscene gestures at him, and cursing at him in public.  He further declared that:

> "In addition to all of this Mr. Lew . . . declares that his intent has always been to create leverage and give weight to [the mother of my child] on my petition . . . for shared legal custody of [the child]."

In support of this latter statement, Di Giacomo quoted from a declaration that Lew had filed in support of his first-round application for a CHRO against Di Giacomo.  In that declaration, Lew had written:

> "We as a residential community have silently suffered the disruption of peace created by the defendant [Di Giacomo] in his engagements with our neighbor and friend . . . (the mother of his child).  Sensitive to the fact that she would likely end up in a legal custody battle and wanting to ensure she has the strongest possible standing when she does, we stay vigilant should she require our emergency intervention . . . ."

Di Giacomo also cited, in his declarations, instances in which he said Lew had tracked his movements in coordination with others in the neighborhood, blocked his path, falsely accused him of having stolen a photograph of Lew's dog from a coffee shop that both men frequented, and "fabricate[d] [other] facts."  In addition, Di  Giacomo said that he had experienced fear and suffered extreme stress as a result of Lew's conduct toward him.

### f. Lew's Response to Di Giacomo's Application for a CHRO

On January 17, 2025, Lew filed a response to Di Giacomo's cross-application for a CHRO in the present case.  In this response, Lew accused Di Giacomo of making various misrepresentation, portraying him "as a crazed mentally unstable lunatic," portraying his dog as "vicious," making

10

"intentional provocative contact with" the dog, and stealing a photograph of the dog from a coffee shop "for reasons unknown but received as a threat."

### g.     The Second of Lew's Motions for Sanctions and Attorneys' Fees

On January 28, 2025, while the motion for sanctions and attorneys' fees he had filed on January 7 was still pending, Lew filed a second motion for sanctions and attorneys' fees.  Whereas the January 7 motion  had targeted conduct by Di Giacomo in the prior case (see *ante*), the January 28 motion targeted conduct of Di Giacomo's *attorney* in the *present* case.  In the January 28 motion, Lew asserted that this same attorney was also Di Giacomo's counsel in the paternity and custody proceedings and thus was familiar with both cases, but that he nonetheless had misrepresented facts in Di Giacomo's October 3 response to Lew's CHRO application in the present case and that he had done so in order to harass Lew, mislead the court, and prolong the litigation.

### h.     The Evidentiary Hearing and the Trial  Court's Ruling

An evidentiary hearing occurred in the present case on January 29, 2025.  At this hearing, the trial court heard live testimony from two witnesses—Lew and Giacomo—that was generally in keeping with their declarations.  At the conclusion of the January hearing, the trial court (Judge Soper) observed that the applicable standard of proof was clear and convincing evidence, and it emphasized that this was "a fairly high standard."  Then, applying this standard, it denied each of the two second round CHRO applications with prejudice.  So doing, the court said:

> "The court has heard testimony of only a handful of actual face-to-face interactions in this case.  And frankly, the one . . . where Mr. [Di] Giacomo pet[ted] Mr. Lew's dog seemed to be a pleasant interaction.  Mr. [Di] Giacomo did send flowers with a card apologizing to Mr. Lew.  I think

11

this is a case where there has been some severe miscommunication on both sides. And I think both parties need to take a step back and recognize that they're both human beings and maybe they made some mistakes in the past, but this is [a] time to move forward. In light of the fact that I do not believe either side has met their burden, the court is going to deny the permanent restraining order on both sides . . . . You generally live fairly close to each other. If you see each other, don't talk to each other, cross the street, try not to antagonize each other. [T]o file a restraining order in cases like this is not welcome. It just seems like it's some bad interactions, it does not go to the level of stalking, it does not go to the level of harassment on either side. That is the court's order."

In this same order, the court also denied Lew's motions for attorneys' fees and sanctions.

Lew timely appealed the January 29 order.

## II. DISCUSSION

In his brief on appeal, Lew argues: (1) that, at the October 7 hearing, the trial court "abused its discretion and violated due process by prejudging the case and refusing to hear argument"; (2) that substantial evidence supported the issuance of a permanent restraining order; (3) that, at the January 29 hearing, the court "committed reversible error by applying the 'clear and convincing' standard to the prediction of future harm"; and (4) that the court abused its discretion in denying his motions for sanctions. In examining these arguments, we review the trial court's findings of fact for substantial evidence, its conclusions of law de novo, and its determinations based on the findings of fact and conclusions of law for an abuse of discretion. (*Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219, 1226; *Salazar v. Eastin* (1995) 9 Cal.4th 836, 849–850.)

12

**A.    Lew's Contention that the Trial Court "Abused Its Discretion and Violated Due Process by Prejudging the Case and Refusing to Hear Argument"**

As noted *ante,* Lew contends that, at the October 7 hearing, the trial court "abused its discretion and violated due process by prejudging the case and refusing to hear argument."  This contention is premised on an inference that the decisions the court made at this hearing—to dissolve the TRO and continue the matter to a future date—cannot be attributable to any cause other than the court having jumped to a premature conclusion that no restraining order was warranted.  But this inference is not supported by the record.

That record consists exclusively of the minute order quoted *ante* from the October 7, 2024.  That order indicates nothing more than that: (1) following a chambers conference, the court dissolved the TRO and continued the matter to a date and time to which the parties agreed; and (2) it did so for the purpose of convening a status conference following anticipated developments in the paternity and custody proceedings.  The record does not indicate that the court prejudged the merits.

The record also does not indicate that any party objected to dissolution of the TRO.  Hence Lew's contention that the court "prejudge[ed] the case and refus[ed] to hear argument" is waived.  (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 772 ["The general rule is that a failure to object in the trial court waives the right to assert error on appeal."]; see also Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2026) ¶ 4:43 "[if the particular form of record appears to show any need for speculation or inference in determining whether error occurred, the record is inadequate"]; *Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186–187 [observing that appellant's "[f]ailure to provide

13

an adequate record on an issue" is "fatal" inasmuch as it "requires that the issue be resolved against [him]," and cataloging "numerous situations" in which "appellate courts have refused to reach the merits of an appellant's claims because no reporter's transcript of a pertinent proceeding or a suitable substitute was provided".])

## B. Lew's Contention that Substantial Evidence Supported the Issuance of a Permanent Restraining Order

Lew contends "[s]ubstantial evidence supported the issuance of a restraining order to prevent future harm." To examine this contention, we begin by describing the statutory provision that governs CHROs.

### 1. Code of Civil Procedure, Section 527.6

The statutory provision that governs CHROs is section 527.6 of the Code of Civil Procedure.[4] Pursuant to section 527.6, "[a] person who has suffered harassment as defined in subdivision (b)" may seek injunctive relief. (§ 527.6, subd. (a)(1).) Subdivision (b) defines harassment as "unlawful violence," "a credible threat of violence," or "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose" (*id.,* (b)(3)); and it defines a " '[c]ourse of conduct' " as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means."[5] (*Id.,* subd. (b)(1)). Section (b) further specifies that "[t]he course of conduct must be that which would cause a reasonable

---

4     All unspecified statutory references are to the Code of Civil Procedure.

5     "Constitutionally protected activity is not included within the meaning of 'course of conduct.' " (§ 527.6, subd. (b)(1).)

14

person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (*Id.,* subd. (b)(3).) In addition, inasmuch as "an injunction serves to prevent future injury and [thus] is not applicable to wrongs that have been completed" (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 402 (*Russell*)), a party who seeks a CHRO also must establish a probability that wrongful acts are likely to recur. (*Id.,* at pp. 401–403.)

A court from which a CHRO is sought may enter a TRO to provide short-term relief (§ 527.6, subds. (d) & (f)) or, after a hearing, a restraining order of longer duration (sometimes referred to as a permanent restraining order). (*Id.,* subds. (g), (i), & (j).) At such a hearing, "the judge shall receive any testimony that is relevant and may make an independent inquiry." (*Id.,* subd. (i).) "If the judge finds by clear and convincing evidence that unlawful harassment exists, an order shall issue prohibiting the harassment." (*Ibid.*)

### 2. Analysis of Lew's Substantial Evidence Argument

In support of his contention that "[s]ubstantial evidence supported the issuance of a restraining order to prevent future harm," Lew argues that "denial of [his application for a CHRO] was error because the record contains substantial evidence satisfying all elements of Code Civ. Proc., § 527.6." But this argument turns the substantial evidence standard on its head.

Under the substantial evidence standard, " ' " 'we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment' " ' "—which is to say " ' " ' "the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing,*" ' " ' " resolving all conflicts in favor of the respondent. (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196

15

Cal.App.4th 456, 465 (*Sonic*), quoting *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.)

More often than not, the substantial evidence standard " 'is . . . implicated when a *defendant* contends that the *plaintiff* succeeded at trial in spite of insufficient evidence.' " (*Sonic, supra,* 196 Cal.App.4th at p. 465, quoting *In re I.W.,* 180 Cal.App.4th at p. 1528, italics added.)  But in a case such as the one before us now, in which " 'the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden' " and " 'the issue on appeal turns on a *failure* of proof at trial,' " " 'it is *misleading* to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' " (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 (*Dreyer's*) [italics added], quoting *In re I.W.,* at p. 1528; accord, *Sonic,* 196 Cal.App.4th at p. 465.)

Here, " 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*Dreyer's, supra,* 218 Cal.App.4th at p. 838, quoting *In re I.W.*, 180 Cal.App.4th at p.1528.)  " 'Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' " (*Dreyer's*, at p. 838, quoting *In re I.W.,* at p. 1528; accord, *Sonic,* 196 Cal.App.4th at p. 466.)  "The appellate court cannot substitute its factual determinations for those of the trial court; it must view all factual matters most favorably to the prevailing party and in support of the judgment." (*Dreyer's,* at p. 838.) " ' "All conflicts, therefore, must be resolved in favor of the respondent." ' " (*Ibid.,* quoting *In re I.W.*, at p. 1528.)

Here, the evidence adduced by Lew was far from uncontradicted, and far from unimpeached. Lew's evidence was contradicted, for example, insofar as Di Giacomo testified: that he had never blown kisses toward Lew; that, subsequent to March 2024, he had "never interacted . . . aggressively" with Lew"; and that, whenever the two men encountered one another in the neighborhood, Di Giacomo would "pass [Lew] passively."

Lew's evidence was impeached by the existence of *other* evidence that supported inferences cutting *against* Lew's claims. These include, for example, an inference that, in seeking a CHRO against Di Giacomo, Lew might have been motivated by a desire to stigmatize Di Giacomo in furtherance of his intention to help "ensure" that, "in [the] legal custody battle," the mother of Di Giacomo's child would have "the strongest possible standing." (See *ante*.) Yet other inferences that might be drawn from the evidence also undercut Lew's case—including, for example, an inference that, in petting Lew's dog, Di Giacomo was motivated by a sentiment other than animus toward Lew; and an inference that any kissing sounds or motions Di Giacomo might have made in Lew's presence[6] were directed affectionately toward Lew's dog rather than with hostility toward Lew.[7]

In addition, in concluding that Lew had not met his burden, the trial court could reasonably have concluded, based on the evidence presented, that Lew had not succeeded in establishing—by the high standard of clear and convincing evidence—that the conduct in which Di Giacomo reportedly had engaged was not such as "would cause a reasonable person to suffer substantial emotional distress" (§ 527.6, subd. (b)(3)), did not "actually cause

---

[6]     As noted ante, Di Giacomo denies having blown kisses toward Lew.

[7]     The potential inferences we identify in this paragraph are just that (i.e., inferences). We make no findings of fact.

[him] substantial emotional distress" (*ibid*.), was unlikely to recur (*Russell, supra,* 112 Cal.App.4th at pp. 401–403), or did not satisfy some other element among those required for a permanent CHRO to issue pursuant to section 527.6.

## C. Lew's Contention that the Trial Court "Committed Reversible Error by Applying the 'Clear and Convincing' Standard to the Prediction Of Future Harm"

Lew contends the trial court "committed reversible error by applying the 'clear and convincing' standard to the prediction of future harm." In support of this contention he asserts: (1) that the "clear and convincing" standard of proof applies only to "evidence that unlawful harassment exists" (§ 527.6, subd. (i)) and not to evidence that such harassment is likely to recur; and (2) that the court nonetheless applied that high standard to determine that Di Giacomo was not likely to harass him in the future. In Lew's own words:

> "Under Code Civ. Proc., § 527.6, a petitioner must establish past harassment by clear and convincing evidence and show only a *reasonable probability* of future harm. ¶ . . . ¶] [Yet,] [d]uring the ruling on January 29, 2025, the trial court explicitly . . . stated:
>
>> " 'I have to find . . . great or irreparable harm would result . . . because of the reasonable probability that unlawful violence will occur in the future, and I have to make that finding by clear and convincing evidence.' "

We see four problems with this contention.

First, the quotation on which the contention is premised is fabricated. Nowhere in the transcript of the January 29 evidentiary hearing, in the order that resulted from that hearing, or in any other part of the record before us did the trial court state that it was applying the "clear and convincing"

18

burden of proof to evidence bearing on the probability that either party would harass the other in the future.

Second, we find no indication in the record that the trial court made any finding regarding the likelihood that harassment would continue into the future.

Third, the trial court having found that Lew failed to carry his burden of establishing by clear and convincing evidence that harassment existed, there was no basis and thus no need for it to consider whether Lew had succeeded in establishing—by *any* burden of proof—a likelihood that (non-existent) harassment would recur.

Fourth, Lew's contention that the trial court applied an incorrect burden of proof is at odds with the text of Code of Civil Procedure and applicable case law. As discussed *ante*, section 527.6 uses the present tense to state that issuance of a CHRO is required "[i]f the judge finds by clear and convincing evidence that unlawful harassment *exists*." (§ 527.6, subd. (i), italics added.) But unlawful harassment cannot reasonably be said to exist in the present if the evidence reveals only past harassment and no sufficient threat of recurrence. (*Russell, supra,* 112 Cal.App.4th at pp. 402–403 ["An injunction is authorized only when it appears that wrongful acts are likely to recur. [¶ . . . ¶] [U]nder subdivision (d) [of section 527.6,] a court cannot issue an injunction unless it finds by clear and convincing evidence that 'unlawful harassment *exists*" (§ 527.6, subd. (d), italics added), not that it existed in the past."].) Thus it follows that evidence demonstrating a likely recurrence of harassment is part of the showing necessary under section 527.6 to establish, by clear and convincing evidence, that "unlawful harassment exists."

Consequently, we reject Lew's contention that the trial court imposed an excessive burden of proof on him.

**D.      Lew's Contention that the Trial Court Abused Its Discretion in Denying His Motions for Sanctions Pursuant to Sections 128.5 and 128.7.**

Lew's final contention is that the trial court abused its discretion in denying his motion for sanctions pursuant to section 128.5 against Di Giacomo, and his motion for sanctions pursuant to section 128.7 against Di Giacomo's counsel.  Section 128.5 permits a trial court to impose sanctions against a party or its counsel, and section 128.7 permits it to impose sanctions against just its counsel, for certain types of litigation misconduct. (Code Civ. Proc., §§ 128.5, subd. (a); 128.7, subds. (a)-(c).)

Focusing first on the motion for sanctions against Di Giacomo pursuant to section 128.5, our analysis begins and ends with the observation that the trial court could not have granted this motion because the conduct it targeted was conduct that had occurred as part of the *prior* CHRO case (see *ante*), rather than conduct that had occurred in the present case—which is the case in which the motion was filed.

Turning next to the motion for sanctions against Di Giacomo's attorney pursuant to section 128.7, we note that section 128.7 includes a safe harbor provision that obligates a litigant seeking such sanctions to desist from filing a sanctions motion until at least 21 days after having served the motion. (§ 128.7, subd. (c)(1).)  The purpose of the 21-day safe harbor provision in section 128.7 is "to allow a party to withdraw an objectionable document and thereby conserve judicial resources as well as save the parties the time and expense of litigating sanctions." (*J.N. v. Goldberg* (2026) 120 Cal.App.5th 544)  The 21-day safe harbor provision is strictly applied.  (*Ibid.*)

20

In the present case, Lew contends without citation to the record that he "served Counsel with the [section 128.7] sanctions motion more than 21 days before filing" and thus "established strict compliance with the 'safe harbor' provision." However, we find no indication in the record that the motion was served at least 21 days before it was filed. This constitutes a failure of proof.

For the reasons stated, we conclude Lew has not satisfied his burden on appeal with respect to the sanctions motions.

## III.    DISPOSITION

The January 29 order is affirmed. Di Giacomo having not appeared in this appeal, no costs are awarded.

KELETY, J.

WE CONCUR:

BUCHANAN, Acting P. J.

RUBIN, J.

21